IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| ARETHA L. RATLIFF, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 10-CV-75-PJC |
| ) | |
| MICHAEL J. ASTRUE, Commissioner of the ) | |
| Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Claimant, Aretha L. Ratliff ("Ratliff"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her applications for disability benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Ratliff appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Ratliff was not disabled. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

### Claimant's Background

Ratliff's appeal is based solely on mental issues, and therefore the Court is not summarizing the evidence relating to physical impairments. At the time of the hearing before the ALJ on June 23, 2008, Ratliff was 38 years old. (R. 20, 24). She asserted onset of disability on April 6, 2005. (R. 23). Ratliff completed eleventh grade and obtained a GED. (R. 25). Ratliff testified that she had worked some in 2006 or 2007 as a hotel housekeeper, but was unable to continue working due to depression. (R. 26-27). She had been incarcerated in a federal prison in the 1990s for possession

of cocaine with intent to distribute. (R. 27-28).

Ratliff testified that she had been diagnosed with bipolar disorder and that she attended counseling. (R. 28). She described her mental problems as a deep depression in which she would not go outside, would not receive phone calls, and would not feel like going to family events. (R. 28-29). She had worked on and off for the previous several years, and she testified that she would work until she went into an episode of depression in which she didn't want to be around anybody. (R. 29).

Ratliff testified that she did not do chores around her house, and at times she wouldn't take care of personal hygiene tasks. *Id.* She said that she would have other times when she would want to talk, and she would go out and do things such as spend money. *Id.* She testified that she vacuumed, dusted, and did other household work if she was in a good mood. (R. 32, 35). She prepared meals for herself and her children, although it might just be sandwiches. (R. 36). She did the laundry, washed the dishes, and purchased groceries once a month, although she said she sometimes sent her mother to do it. *Id.*

Ratliff testified that she took medication to control the mood swings, and it worked to keep her calm and keep her from getting as depressed, but it also made her drowsy. (R. 29-30). She testified that she had episodes of panic attacks about four times a week, and she had experienced one a week or so before the hearing when she went to the emergency room. (R. 30). She described a panic attack as an episode when her heart beat really fast for 15 minutes. *Id.* Ratliff testified that she had low energy and trouble getting motivated. *Id.* She had trouble with concentration and memory, and she couldn't pay attention for long. (R. 30-31).

Ratliff testified that she spent her day in her apartment and would not answer the telephone or the door. (R. 31). She watched television, but she didn't have the attention span to complete a

2

show, and she would change channels. *Id.*

She testified that her medications made her sleepy, but she also testified that she had trouble sleeping. (R. 33). She said that for the months before the hearing, she had only gotten three hours of sleep at night. *Id.*

Ratliff was seen by Dallas County Hospital District outpatient department on October 28, 2003. The detailed notes are difficult to read, but the impression appears to be moderate major depressive disorder, and medications were prescribed. (R. 199). On November 4, 2003, Ratliff reported crying spells, and the physician's impression was severe major depressive disorder with a note to rule out PTSD. (R. 198). On February 24, 2004, Ratliff reported that she had been kidnapped, raped, and held hostage by her husband at gun point over a period of four days. (R. 197). She reported depressed mood, anxiety, crying spells, irritability, poor concentration, and flashbacks. *Id.* The physician's impression was major depressive disorder, and several medications were prescribed. *Id.* Medical records from Parkland Health & Hospital System in Dallas, Texas, reflect that Ratliff sought treatment in the emergency room on March 2, 2004 after she was assaulted by her husband. (R. 180).

The administrative transcript includes an initial treatment plan with ABC Behavioral Health, L.L.C. dated April 13, 2005. (R. 202-12). The summary on the first page stated that Ratliff was 35 years old and divorced, having left her abusive husband in 2003. (R. 202). Her Axis I[1] diagnosis was listed as bipolar II disorder, although "cocaine transportation" was also typed in that space. *Id.*

---

[1]The multiaxial system "facilitates comprehensive and systematic evaluation." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000).

Axis II listed "BP traits." *Id.* Ratliff's Global Assessment of Functioning ("GAF")[2] was listed as 45 both currently and in the previous year. The signature page has the signature of Kaci Springer MS, QMHP. (R. 202, 212). The diagnoses and GAF assessments in the treatment plan follow those of a psychiatric evaluation that appears to be signed by Dr. Sheehan. (R. 201, 219-22). Ratliff was started on medications. (R. 222).

Ratliff was seen for follow up by Dr. Sheehan on May 2, 2005, and June 20, 2005 . (R. 215-18). She was seen as a walk-in on July 18, 2005 due to problems with her medications. (R. 213-14).

Ratliff was evaluated by agency consultant Stephanie C. Crall, Ph.D. on June 14, 2006. (R. 253-59). Dr. Crall reviewed Ratliff's history and reported that Ratliff was not on psychiatric medications at the date of examination. (R. 253-54). On examination, Ratliff's functional memory was not intact. (R. 255). Her remote memory function appeared adequate, and her general fund of knowledge appeared to be below average. *Id.* Dr. Crall's diagnoses on Axis I were chronic, moderate major depressive disorder, and chronic PTSD, with no diagnosis on Axis II. *Id.*

Ratliff saw David N. Gilbert, M.D. at OU Physicians - Internal Medicine on June 21, 2006, for back pain and a complaint of anxiety. (R. 265-67). Ratliff related her treatment at ABC

---

[2]The GAF score represents Axis V of a Multiaxial Assessment system. *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32-36 (Text Revision 4th ed. 2000). A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id*. at 32. The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id*. at 34. A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id*. A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id*.

Behavioral and her evaluation by Dr. Crall. (R. 265). On examination, Dr. Gilbert described Ratliff as having normal mood and affect, with normal attention span and concentration. (R. 266). Several prescriptions were given. (R. 267).

Ratliff apparently presented at Family & Children's Services for mental health treatment on March 16, 2007. (R. 343-58). The assessment was signed by Rachel R. Wright, B.S. (R. 353). It stated that Ratliff's current GAF was 54, and the summary stated that Ratliff appeared to suffer from bipolar I disorder, most recent episode depressed (moderate), and that she met criteria for cannabis dependence, "FSR" and alcohol dependence. *Id.* Ratliff saw Tracy Loper, M.D. for pharmacological management on April 9, 2007, and Dr. Loper stated Ratliff's Axis I diagnoses as bipolar I mixed, severe, without psychosis and cannibis and alcohol abuse, with notes to rule out psychotic illness and anxiety disorder. (R. 341-42). Dr. Loper stated Ratliff's GAF as 46/56, presumably meaning her current GAF was 46, and her highest GAF in the past year was 56. (R. 341). The only other record from Family & Children's Services is an unsigned treatment plan dated July 19, 2007. (R. 331-39). Nonexamining agency consultant Burnard Pearce, Ph.D. completed a Psychiatric Review Technique form on August 3, 2006. (R. 284-97). Dr. Pearce checked boxes indicating that Ratliff had an affective disorder, but that her impairment was not severe. (R. 284). For category 12.04, Dr. Pearce noted Ratliff's chronic, moderate major depressive disorder. (R. 287). For the "Paragraph B Criteria,"[3] Dr. Pearce found only mild

---

[3]There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of ADLs, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") §12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

limitations in the three categories of restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. (R. 294). He found no episodes of decompensation. *Id.* In the "Consultant's Notes" portion of the form, Dr. Pearce briefly reviewed Ratliff's mental health history, including that she had never been treated in an inpatient setting and that she was not receiving formal psychiatric medications or therapy at the time of his evaluation. (R. 296). He noted that Ratliff asserted that she could not afford those services. *Id.* He noted that Ratliff had previously worked at several jobs. *Id.* Apparently based on Dr. Crall's examination and report, Dr. Pearce stated that Ratliff was "cognitively intact and able to perform her activities of daily living with no more than a modest degree of restriction." *Id.*

## Procedural History

Ratliff filed applications on March 7, 2006 seeking disability insurance benefits and supplemental security income benefits under Titles II and XVI, 42 U.S.C. §§ 401 *et seq.* (R. 95-103). Ratliff alleged onset of disability as April 6, 2005. (R. 98). The applications were denied initially and on reconsideration. (R. 49-56, 60-64). A hearing before ALJ Charles Headrick was held June 23, 2008 in Tulsa, Oklahoma. (R. 20-42). By decision dated August 13, 2008, the ALJ found that Ratliff was not disabled. (R. 12-19). On December 11, 2009, the Appeals Council denied review of the ALJ's findings. (R. 1-4). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental

impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[4] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court

---

[4]Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

### Decision of the Administrative Law Judge

The ALJ found that Ratliff's date last insured was September 30, 2006. (R. 14). At Step One, the ALJ found that Ratliff had not engaged in any substantial gainful activity during the relevant period, which was after Ratliff's alleged onset date of April 6, 2005. *Id.* At Step Two, the ALJ found that Ratliff had a severe impairment of low back pain. *Id.* The ALJ discussed Ratliff's allegation of disabling mental impairments and found that they were non-severe because they did not have more than a minimal effect on Ratliff's ability to work. (R. 14-15). He discussed the Paragraph B criteria and found that Ratliff had only a mild limitation in her activities of daily living, social functioning, and concentration, persistence, or pace, with no episodes of decompensation. (R. 15). At Step Three, the ALJ found that Ratliff's impairments did not meet a Listing. (R. 15-16).

The ALJ determined that Ratliff had the RFC to perform the full range of light work. (R. 16). At Step Four, the ALJ found that Ratliff could perform her past relevant work as a housekeeper and as a day care worker. (R. 18). Therefore, the ALJ found that Ratliff was not disabled during the relevant period. *Id.*

**Review**

Ratliff raises the single issue that the ALJ should have included a mental limitation in the RFC determination. Because the undersigned finds that the ALJ's decision is supported by substantial evidence and complies with legal requirements, the ALJ's decision is affirmed.

Ratliff's argument is that the ALJ did not sufficiently explain the weight that he gave to the treating sources and to the opinion evidence of the nonexamining consultant Dr. Woodcock. As an initial inquiry, the undersigned finds that none of the evidence of the two treating sources, ABC Behavioral Health and Family & Children's Services, constitutes a treating physician opinion. The Tenth Circuit in *Cowan v. Astrue,* 552 F.3d 1182, 1188-89 (10th Cir. 2008) explained that a "true medical opinion" was one that contained a doctor's "judgment about the nature and severity of [the claimant's] physical limitations, or any information about what activities [the claimant] could still perform." Thus, the court found that a statement by a treating physician that the claimant had a stroke "and I feel he may never return to work" was not a true medical opinion. *Id. See also Martinez v. Astrue,* 316 Fed. Appx. 819, 822-23 (10th Cir. 2009) (unpublished) (ALJ did not need to provide specific legitimate reasons for rejecting portion of treating physician's letter that contained only generalized statements); *Mann v. Astrue*, 284 Fed. Appx. 567, 570 (10th Cir. 2008) (unpublished) (treating physician recommendation that the claimant see an orthopedic specialist was not a treating physician opinion because it did not address functional limitations).

Here, Ratliff's treatment history with both Dr. Sheehan at ABC Behavioral Health and Dr. Loper at Family & Children's Services was very brief. Dr. Sheehan apparently did an initial evaluation, and then saw Ratliff on three additional occasions regarding medications. (R. 201, 213-18). The brief character of the treating relationship makes the evidence of Dr. Sheehan of less import than if that physician had treated Ratliff over a longitudinal history. The GAF evidence,

which is Ratliff's primary focus, was given at the initial evaluation, and therefore was not a product of the treating relationship, but of a one-time assessment. While GAF evidence can sometimes be treating physician evidence that requires the ALJ to discuss it and to explain what weight he gave to it, here the evidence of the GAF score of 45 given by Dr. Sheehan after seeing Ratliff for an initial evaluation does not fit in that category. *See, e.g., Holcomb v. Astrue*, 389 Fed. Appx. 757, 760 (10th Cir. 2010) (unpublished) (under circumstances of case, ALJ was not required to discuss low GAF scores); *but see Givens v. Astrue*, 251 Fed. Appx. 561, 567 (10th Cir. 2007) (unpublished) (ALJ erred by failing to analyze GAF of 50 as a treating physician opinion). The GAF evidence from Family & Children's Services is of similar character, in that the administrative transcript contains only one appointment when Ratliff saw Dr. Loper. (R. 341-42). Because Dr. Loper's assessment was from an initial evaluation of Ratliff, rather than from a treating relationship, it can not be characterized as a treating physician opinion that the ALJ was required to weigh.

It must be emphasized that this is not a case where the ALJ ignored treating evidence, including GAF scores. Here, the ALJ accurately recounted the records of ABC Behavioral Health and of Family & Children's Services, including the cited GAF scores. (R. 17-18). The GAF scores were not necessarily inconsistent with the ALJ's finding that Ratliff's mental issues were non-severe. *See Boucher v. Astrue*, 371 Fed. Appx. 917, 920 (10th Cir. 2010) (unpublished) (ALJ's finding that mental limitations were mild was supported by substantial evidence even though claimant had a GAF of 55); *Camp v. Barnhart*, 103 Fed. Appx. 352 (10th Cir. 2004) (unpublished) (GAF score of 50 did not establish that claimant's mental impairments were severe).

Additionally, the ALJ specifically cited to the opinion of Dr. Pearce in support of his RFC determination and his decision that Ratliff's mental impairments were non-severe. (R. 18). The ALJ was entitled to consider the opinion evidence of the nonexamining consultant. *Flaherty v.*

10

*Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2007); *Weaver v. Astrue*, 353 Fed. Appx. 151, 154-55 (10th Cir. 2009) (unpublished). The ALJ's RFC determination is supported by substantial evidence and is in compliance with legal requirements.

Finally, Ratliff makes an argument that the ALJ impermissibly relied on Ratliff's history as a basis for finding Ratliff's mental impairments non-severe, stating that "the ALJ relied only on Ratliff's prior bad acts to discount Ratliff's mental impairments." Plaintiff's Brief, Dkt. #12, p. 7. The undersigned finds this argument to be unclear and unsupported by the ALJ's written decision. As discussed above, the ALJ thoroughly and accurately recounted all of the evidence relating to Ratliff's mental health treatment. (R. 14-18). He did state at Step Two that his finding that her mental limitations were not severe was "affected" by his finding that Ratliff was not fully credible. (R. 14). The Court finds nothing improper about this statement. Later in his decision, the ALJ made his credibility determination, stating that Ratliff's diagnoses of alcohol dependence and cannabis dependence diminished her credibility, and also stating that her convictions for bogus checks and intent to distribute were the biggest factor in finding that she had diminished credibility. (R. 18). The ALJ had every right to consider Ratliff's criminal history in assessing her credibility. *See, e.g., Bolton v. Barnhart*, 117 Fed. Appx. 80, 85 (10th Cir. 2004) (affirming credibility assessment based partially on criminal record). The ALJ's credibility assessment was sufficient, and the Court finds that the ALJ's decision that Ratliff's mental impairments were non-severe was not impermissibly influenced by Ratliff's history of incarceration and substance abuse. Because the ALJ's decision was supported by substantial evidence and complied with legal requirements, it is affirmed.

## Conclusion

The decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied. The decision is **AFFIRMED**.

Dated this 31st day of March, 2011.

Paul J. Cleary  
United States Magistrate Judge